

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL



This Opinion
Overrules Opinion
# O-4587

Honorable O. P. Lockhart, Chairman
Board of Insurance Commissioners
Austin, Texas

Dear Sir:

Opinion No. O-4587A
Re: Applicability of Articles 4705
and 4706 V. A. C. S. to title
insurance companies organized
under Article 1302a, V. A. C. S.,
and eligibility of property to
be received in payment of capi-
tal stock and surplus in such
companies.

Pursuant to the request contained in your letter of
November 4, 1942, we have reconsidered our answers to Ques-
tions 7 and 9 in our Opinion No. O-4587. As a consequence of
our reconsideration, the aforementioned answers are hereby
withdrawn and this opinion is substituted in lieu thereof.

Question No. 7 in Opinion No. O-4587 was stated as
follows:

Does Article 4705 V. A. C. S. govern the eli-
gibility of property that may be initially received
in payment of the capital stock of title insurance
companies organized under Article 1302a V. A. C. S.,
and does Article 4706 V. A. C. S. govern the eligi-
bility of property in which its surplus funds may
be invested?

Although Articles 4705 and 4706 respectively define
the capital stock and surplus requirements of insurance com-
panies generally, these Articles are prefaced by a phrase con-
fining their applicability to "any such company". This phrase
occurs throughout the various Articles comprising Chapter 2
of Title 78, R. C. S., and obviously refers to insurance com-
panies organized under Articles 4699 and 4700. Unless these
latter two Articles enter into the creation of title insurance
companies under Article 1302a, Articles 4705 and 4706 are
plainly inapplicable to such companies.

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Two types of statutes are to be found pertaining to the creation of private corporations: (a) statutes authorizing the creation of corporations for stated purposes, and (b) statutes prescribing the mechanism for effecting the incorporation. Prior to the passage of Article 1302a, Section 57 of Article 1302 authorized the incorporation of title insurance companies and the provisions of Chapter 2 of Title 32, R. C. S., prescribed the mechanism therefor, with Articles 4699 and 4700 entering not at all into their creation. Section 23 of Article 1302a removed Section 57 of Article 1302 as an authorization for the creation of such companies, but with certain exceptions (e. g. Sections 2, 6, 8, 10 and 12) Article 1302a did not purport to alter the mode by which such companies are created. If the Legislature had intended that such companies henceforth employ the mechanism of Articles 4699 and 4700, it seems reasonable to assume that it would have explicitly so provided. In the absence of such a provision, compelling becomes the conclusion that the general corporation laws continue to govern the creation of title insurance companies insofar as they are not inconsistent with the explicit provisions of Article 1302a. It will be noticed that by virtue of Section 8 of Article 1302a, the Board of Insurance Commissioners is vested with the duty of filing the charters of such companies; consequently, whenever appropriate, the Board is to be substituted for and to assume the duties of the Secretary of State in effecting the provisions of Chapter 2 of Title 32.

This conclusion makes impossible the application of Articles 4705 and 4706 to title insurance companies; consequently, Question No. 7 is answered in the negative.

To hold otherwise would be to say that title insurance companies must invest part of their assets according to Article 4725 (per Section 6 of Article 1302a), that they may invest part of their capital stock in an abstract plant, that they must invest the remainder of their capital stock in the items enumerated by Article 4705, that they must invest their surplus according to Article 4706, and, finally, that they must invest their premium reserves according to Article 4725 (per Section 10 of Article 1302a). Such segregation and earmarking of assets would be well nigh impossible to establish and maintain and would result in the regulation of the investments of these companies to an extent far greater than is done with life and casualty insurance companies. Since title insurance is commonly known to be a type of insurance in which

the risk of loss is very small and in which the premiums are very large in comparison with loss payments, it is unlikely that the Legislature intended such a high degree of regulation.

Moreover, it is common knowledge--and Article 1302a specifically recognizes--that companies doing a title insurance business conduct many additional activities. Most of these additional activities, if standing alone, would not be regulated by the State. If Articles 4705 and 4706 were to be imposed on these companies, these activities as well as the title insurance business would be subjected to extreme regulation. It seems reasonable to believe that the Legislature intended that the reserves established by Sections 6 and 10 of Article 1302a should isolate a portion of the assets of these companies for the protection of the holders of title insurance policies, and that the remainder of such assets should be free and unencumbered for use in the other activities of such companies.

Finally, our conclusion is strengthened by the established practice of your department. Although your original opinion request asked ". . . is our construction correct that (Article 1302a) makes the provisions of Article 4705 applicable . . ." your letter of November 4th states that you have never considered Articles 4705 and 4706 applicable to title insurance companies and that any intimation to the contrary in your original letter was "erroneous and inadvertent". Accepting your most recent letter as embodying a correct statement of your departmental practice, it is significant that during the thirteen years since the passage of Article 1302a the Legislature has never seen fit to question or to alter your practice. Such an established construction when coupled with complete Legislative silence and, presumably, acquiescence lends weight to the opinion above expressed.

Question No. 9 in Opinion No. O-4587 was copied from your supplemental request for opinion and reads as follows:

"In studying the schedule of assets accompanying the affidavit of the incorporators, which assets will be tendered in payment of capital stock and surplus (before actual filing, the charter will probably be rewritten so as to divide these assets up into a minimum of $100,000 capital stock and $5,000 surplus) we observe that the assets are affirmatively disclosed to embrace (a) fee titles to

Honorable O. P. Lockhart, Chairman, Page 4

real estate, (b) real estate purchase contracts, and (c) notes or other monetary obligations secured by first lien upon real estate, some of all three of which are located in the State of New Mexico and some in the State of Texas. Of course, before either chartering or licensing this Company, this Department will discharge its responsibility of determining whether or not the assets so listed in the schedule to the affidavit are actually valid fee titles, real estate purchase contracts and obligations secured by first liens upon real estate, and the location thereof (whether in Texas or New Mexico) and the value thereof. But, for the purpose of determining the legal eligibility of the various classes of assets so tendered in payment of the authorized capital stock and the surplus funds which may be set up initially in incorporating this Company, we ask you to answer specifically the following questions in addition to those propounded heretofore, regardless of whether you hold Articles 4705 and 4706 applicable, or whether you hold Article 1302A or some other article or articles of the statutes applicable, with reference to the investment of the capital and surplus funds of this Company:

"A. Are fee titles to real estate situated in Texas eligible to be received in payment of the capital stock funds of this Company?

"B. Can fee titles to real estate outside of Texas be received in payment of capital stock of this Company?

"C. Can fee titles to real estate in Texas be accepted in payment of surplus funds of this Company?

"D. Can fee titles to real estate outside of Texas be accepted in payment of surplus of this Company?

"E. Can real estate purchase contracts upon real property in Texas be accepted in payment of capital stock of this Company?

"F. Can real estate purchase contracts upon real property situated outside of Texas be accepted in payment of capital stock of this Company?

"G. Can real estate purchase contracts upon property in Texas be accepted in payment of surplus of this Company?

"H. Can real estate purchase contracts upon real property outside of Texas be accepted in payment of surplus of this Company?

"I. Can notes or other monetary obligations secured by first liens upon real estate in Texas be received in payment of capital stock of this Company?

"J. Can notes or other obligations secured by first liens upon real estate situated outside of Texas be received in payment of capital stock of this Company?

"K. Can notes or other obligations secured by first liens upon real estate situated in Texas be received in payment of surplus of this Company?

"L. Can notes and other obligations secured by first liens upon real estate situated outside of Texas be received in payment of the surplus of this Company?"

We do not attempt to answer subdivisions E, F, G, and H, since the term "real estate purchase contracts" does not give this department sufficient facts upon which to base an opinion. Also we are disregarding the phrase "or other monetary obligations" contained in subdivisions I, J, K and L, because such phrase is too indefinite to be the basis of an opinion.

The provisions in the general corporation laws relative to the receipt of property for capital stock are found in Article 1308:

"Art. 1308. (1125-1126-1127) Capital stock.--
Before the charter of a private corporation created for profit can be filed by the Secretary of State,

the full amount of its authorized capital stock must be in good faith subscribed by its stockholders and fifty per cent thereof paid in cash, or its equivalent in other property or labor done, the product of which shall be worth to the company the actual value at which it was taken or at which the property was received. The affidavit of those who executed the charter shall be furnished to the Secretary of State, showing:

"1. The name, residence and postoffice address of each subscriber to the capital stock of such company;

"2. The amount subscribed by each, and the amount paid by each;

"3. The cash value of any property received, giving its description, location and from whom and the price at which it was received;

"4. The amount, character and value of labor done, from whom, and price at which it was received. (Acts 1901, p. 18; Acts 1897, p. 192; Acts 1907, p. 309; G. L. vol. 10, p. 246.)"

It will be noticed that this statute employs the word "property" without attempting to specify permissible kinds of property. However, Articles 1359 and 1360 provide:

"Article 1359. (1175) Conditions of purchase.— No private corporation shall be permitted to purchase any lands under any provision of this chapter, unless the lands so purchased are necessary to enable such corporation to do business in this State, or except where such land is purchased in due course of business to secure the payment of debt. (Acts 1893, p. 36; Acts 1897, p. 48; G. L. vol. 10, pp. 466, 1102.)

"Article 1360. (1176) Sale of surplus.—All private corporations authorized by the laws of Texas, to do business in this State, whose main purpose is not the acquisition or ownership of lands, which have or may acquire by lease, purchase or otherwise

Honorable O. F. Lockhart, Chairman, Page 7

more land than is necessary to enable them to carry on their business, shall, within fifteen years from the date said land may be acquired, in good faith sell and convey in fee simple all lands so acquired which are not necessary for the transaction of their business."

And Article 1364 declares that:

"Art. 1364. (1180) Escheat proceedings.-- All corporations holding lands contrary to the provisions of this law shall hold the same subject to forfeiture and escheat proceedings. The Attorney General, or any district or county attorney, when either of them has reason to believe that any corporation is holding lands in violation of this law, shall institute suit in the name of the State of Texas, in Travis County, or in any county in Texas where such corporation may have an agent, or in any county where any part of the land may be situated, against such corporation, as is provided for the escheat of estates of deceased persons dying without devise thereof and having no heirs. (Acts 1893, p. 36; G. L. vol. 10, p. 466.)"

In the case of Campbell v. Hood, 35 S. W. (2d) 93 (Com. App.), the court said:

"For many years it has been the established policy of our state to prohibit corporations, with certain exceptions, from acquiring land. . . It is true, as argued by the plaintiffs in error, that if the corporation has consummated the deal by acquiring the lands no one could have questioned its title except the state."

We can find no law requiring the refusal of a corporate charter because a portion of its capital stock has been purchased with realty which the corporation is not authorized to hold. In accordance with the language of the above case, we feel that the acquisition of such property may only be questioned by the State through escheat proceedings under Article 1364 and, in an appropriate case, through ultra vires proceedings.

It will further be noticed that Article 1306 does not specify that property so received shall be located within

321

the State. Consequently, we answer subdivisions A, B, C, and D of Question No. 9 in the affirmative.

For the reasons above stated and for the additional reason that private corporations are under no disability with respect to acquiring and holding notes secured by first liens upon realty, subdivisions I, J, K and L of Question No. 9 are also answered in the affirmative.

Trusting that the foregoing fully answers your inquiries, we are

Very truly yours

ATTORNEY GENERAL OF TEXAS

By *R. Dean Moorhead*

R. Dean Moorhead
Assistant

RDM:mp

APPROVED DEC 14, 1942

*Gerald C. Mann*

ATTORNEY GENERAL OF TEXAS